UNITED STATES, Appellee,

v.

David A. ROBERTSON, Sergeant First
Class U.S. Army, Appellant.

No. 67,524.
CMR No. 8902851.

U.S. Court of Military Appeals.

Argued Nov. 3, 1992.

Decided Sept. 20, 1993.

For Appellant: *Captain Teresa L. Norris* (argued); *Lieutenant Colonel James H. Weise* and *Captain Michael P. Moran* (on brief).

For Appellee: *Captain Steven M. Walters* (argued); *Major Kenneth T. Grant, Lieutenant Colonel Daniel J. Dell'Orto, Colonel Dayton M. Cramer* (on brief); *Lieutenant Colonel Joseph A. Russelburg* and *Captain Timothy W. Lucas.*

*Opinion of the Court*

WISS, Judge:

After a contested trial, a general court-martial of officer and enlisted members convicted appellant of involuntary manslaughter and committing indecent acts with a child under the age of 16 years. *See* Arts. 119 and 134, Uniform Code of Military Justice, 10 USC §§ 919 and 934, respectively. The members sentenced appellant to a bad-conduct discharge, confine-

ment for 1 year, and reduction to the lowest enlisted grade. The convening authority approved these results.

On appeal, the Court of Military Review concluded that the evidence was insufficient to establish the required criminal intent relating to the indecent acts.[1] 33 MJ 832, 833 (1991). Additionally, that court concluded that "there is insufficient evidence to support a finding of culpable negligence, and thus the manslaughter conviction cannot stand." In the court's view, however, the evidence was both legally and factually sufficient "to support a finding of negligent homicide. Art. 134, UCMJ." *Id.* at 834. Accordingly, the court affirmed only a finding of negligent homicide and, on reassessment of the sentence "on the basis of the errors noted and the entire record," a sentence extending only to reduction to the grade of E–5. *Id.* at 835.

On appellant's petition, this Court agreed to review: "Whether the Army court erred in finding the evidence to be sufficient as a matter of law to support a finding of guilty to negligent homicide in violation of ... Article 134." On further consideration of the decision below, we agree with one prong of appellant's multi-faceted attack within this issue: We hold that the evidence of appellant's negligence—even the simple negligence that is in issue in negligent homicide, *see* para. 85b(4), Part IV, Manual for Courts–Martial, United States, 1984—is insufficient as a matter of law to support the finding affirmed below.

I

The opinion of the Court of Military Review told the truly sad story of the anorex-ic/bulimic mission that appellant's son Brad set for himself and the tragic, fatal consequences. Added to this human tragedy for appellant was his own court-martial for alleged negligence in letting his son pursue his suicidal course.

As already indicated, the Court of Military Review held that the evidence was insufficient to support a finding of culpable negligence, *see* Art. 119(b)(1). The court concluded, though, that the evidence did reflect beyond a reasonable doubt appellant's simple negligence, so a conviction of negligent homicide under Article 134 could be affirmed. *See* para. 85b(4).

In this Court, appellant assails that conclusion on three grounds: "1) [T]here is insufficient proof that appellant's conduct was negligent; 2) there is insufficient proof that appellant's conduct was the proximate cause of Brad's death; and 3) there is no evidence whatsoever that appellant's conduct was prejudicial to good order and discipline or service-discrediting." Final Brief at 8. Because, as just indicated, we agree with his first ground, we do not need to address the other two.

II

A

We will not fully retell the story that is recounted in the opinion of the Court of Military Review. We will, though, trace the thread of its development and, in the process, expressly note some important events, uncontested in the evidence, that the court below either did not recite or noted only fleetingly.

---

1. Appellant had been convicted of a charge alleging that he had "commit[ted] an indecent act [with his 14–year–old stepdaughter] by giving her a vibrator and simulations of the male penis, with intent to arouse or appeal to the sexual desires of the said [stepdaughter] or [appellant]." At trial, appellant had testified that he merely had given the vibrator to his stepdaughter at her request because otherwise, in his judgment, his stepdaughter—who he had concluded was not a typical naive 14–year–old— would become sexually involved with boys. In the Court of Military Review appellant argued that that act, "unaccompanied by the requisite intent to arouse his sexual passions, those of the child, or both, causes this conviction to fail for lack of sufficient proof." The court agreed. Acknowledging that, "[t]hough many parents would condemn the appellant's actions as a serious error in judgment," the court held "that the evidence fails to establish the required criminal intent by proof of behavior or language which accompanied the alleged indecent act. *See United States v. Orben*, 28 MJ 172 (CMA 1989), *cert. denied*, 493 U.S. 854, 110 S.Ct. 157, 107 L.Ed.2d 115 (1989)." 33 MJ at 833.

Brad's mother had had custody of him since her divorce from appellant in 1981, and appellant had not seen his son since then until he visited Brad at his home in Kansas during Christmas of 1987. Their relationship renewed, Brad visited his father in New Jersey during spring break in 1988.

At the time he arrived in New Jersey in early April, Brad was well along on his journey toward self-destruction. Trial testimony indicates that Brad began this pattern of abuse when he discovered during a virus that he had contracted in the fall of 1986 that, if he vomited and did not eat, he would lose weight—a noteworthy discovery to Brad, who had been "quite chunky" at "one point in his life." Before he came into appellant's care in April 1988, Brad already had been hospitalized once for a week in connection with his difficulty in eating and his weight loss; had seen a medical doctor 4 times in February 1988 (who could find "no physical cause" for Brad's condition and suspected "emotional problems"); and had seen a psychiatrist thereafter 5 times over 2 weeks.

The psychiatrist's treatment involved hypnosis in an effort to help Brad relax and hold down his food, and it ended when Brad reported to the doctor, just before going to New Jersey, that he had stopped vomiting. The psychiatrist's diagnosis was chronic low-level depression, characterized by eating disturbances. Actually, Brad's medical history involved *three* distinct episodic periods of nausea and vomiting over the year and a half preceding his visiting his father.

Brad's mother testified that, at one time, Brad had weighed 180 pounds, though she did not tell this to either the medical doctor or the psychiatrist who treated Brad in early 1988. In fact, she did not tell the medical doctor about Brad's earlier hospitalization, either. At the time Brad first saw the psychiatrist, he weighed 140 pounds, and the doctor knew only that Brad once had weighed 160 pounds. Consequently, neither of these doctors diagnosed anorexia.

The Court of Military Review found that, notwithstanding this history, "appellant received essentially no information from Brad's mother at the time of the boy's arrival to alert him to Brad's previous weight loss and erratic eating habits." 33 MJ at 833. Appellant's wife testified concerning specifically what Brad's mother had told them in that regard:

All she told me was, "Watch what he's eating 'cause his stomach's iffy." I said, "What do you mean it's iffy? Is it anorexia?" 'cause I just watched a TV show on it. And, she says, "No, it's a virus. It's a stomach virus." Well I had an ulcer when I was 15. I thought stomach virus, weak, iffy stomach, bland diet, so I went and stocked up on bland foods; cottage cheese, basically an ulcer diet.

Appellant and his wife noticed, on Brad's arrival, that Brad looked thin. Over the next couple of weeks, Brad seemed mostly to pick at his food rather than to eat much of it. On April 17, Brad complained of dizziness, so appellant took him to the hospital emergency room, where Brad was examined and referred to the pediatric clinic.

On April 20, appellant and Brad saw Dr. (Lieutenant Colonel) Grace Nadhiry at the clinic. Dr. Nadhiry testified in part as follows in response to a question concerning what transpired during his visit to her office:

A. And the first thing Brad stated was that he was in perfectly good health and the reason he was in was just because the doctors [in the emergency room] had asked him to come in. And, of course, I tried to get more history from Brad about his problem and the reasons for his dizziness at that time when he was in the emergency room, and tried to get more history into his eating habits, about how he was doing in school, at which time he stated that he used to have nerves and so he doesn't eat very well, and he had lost some weight and that brought up the topic of anorexia. Then he stated that he had been evaluated for anorexia by psychiatrists and he was—he had been eval-

uated and was told by psychiatrists that he didn't have anorexia.

Q. Was Brad, at this time, resistant to you?

A. Brad was unfriendly. He was— yeah, I could say he was resistant.

Q. Was his father present throughout the entire visit?

A. He was.

Dr. Nadhiry weighed Brad during her examination, finding that he then weighed 122 pounds; she plotted this weight on a weight chart for boys of Brad's age and found that he was at the 50th percentile. She did notice that his weight on that occasion was less than the 125 pounds that had been recorded as his weight in the emergency room 3 days earlier. When asked, however, whether that weight loss had caused her "any concern," she answered, "Not from the appearance that Brad had. Brad clinically looked perfectly in good health."

Dr. Nadhiry talked to both Brad and appellant about anorexia and the problems associated with it. She talked to Brad in a way intended to elicit his confidence and friendship and asked to have his records from Kansas brought to her. Because the word "psychiatrist really scares most children from Brad's stage and with his type of attitude, which was unfriendly," Dr. Nadhiry "talked to him about a psychologist and counseling." Brad responded that "he didn't need that."

Dr. Nadhiry did not order any lab work because that had been done in the emergency room; neither did she order a test to "check electrolytes." She explained: "See, you have to realize one thing, the patient was in very good clinical state and his blood pressure was normal."

Because this was simply a "sick call follow-up type of appointment which was a very short appointment," Dr. Nadhiry told appellant about "the problems that could come up" and told appellant that she wanted to see Brad again in 3 to 4 weeks. She characterized appellant during this visit as "a very concerned father."

During his testimony, appellant addressed Brad's attitude toward doctors, hospitals, etc.—an attitude that Dr. Nadhiry had characterized as "unfriendly":

And she [Dr. Nadhiry] was talking to Brad and I. She mentioned the subject of anorexia and/or bulimia. And Brad dang near went right out through the ceiling. He was very vehement and he said, "No, I've been checked for that. I don't have it. I don't want psychiatric, psychologist, nothing." And that persisted later in the evening into the discussion at home, still the vehemence that this was not the problem. He wanted no part of these people.

Over the next 3 weeks, appellant noticed that Brad still was not eating much, which he believed to be atypical for a 15–year-old. That factor, plus Dr. Nadhiry's advice that she should see him again in 3 to 4 weeks, led appellant to decide that "I think I will get this boy back." He described what then happened:

I had the number [to the clinic] laying on my dresser in my bedroom where the phone is. And I wasn't trying to hide anything. I left the bedroom door open and Brad walked up, "What you going to do, dad?" "I think it's time we got back to Colonel Nadhiry." That's when I had some real serious trouble with a 15—14– almost 15–year old that was ready to punch my running lights out, I picked up that phone. I mean, we're talking balled fist, fighting stance, "No, I am not going."

With this adamant determination not to go back to Dr. Nadhiry, appellant decided that physically forcing Brad to return would be counterproductive. Moreover, Brad had told him in conversations about the "stress and turmoil" in the family situation in Kansas, and appellant believed that it was important for Brad to feel comfortable and accepted by appellant. Accordingly, appellant decided on a more "low-keyed" approach of trying to persuade Brad to be more receptive to medical attention (like he had been earlier to eye and dental exams). He explained:

My opinion, based on his comments to me, was that he'd been yelled and screamed at enough. And in dealing with my two stepdaughters because of their situation, I have found I can go much further by trying—by making my points in a calm conversational tone. I let Brad know that I was concerned.

Appellant continued:

I finally—I think I had finally got through to him and this was as close as I came to really jumping on him, although there were many times I wanted to. He had been complaining [that his] stomach didn't want to accept the food, blase, but he—again, the doctor vehement [sic], "No, I'm not going." Finally, one evening in the dining room, I looked at him, I said, "Son, you say your stomach's bothering you?" "Yes." "Are you a doctor?" "No." I said, "Then you can't handle yourself, can you?" He says, "No." I said, "Son, then you need to do one of two things, reach a conclusion." I says, "One, either get yourself back to a doctor, or two, remember what you learned in high school biology about the intake of food. And if you don't want to go back to the doctor, get ahold of an undertaker of your choice and make your own funeral arrangements because inevitably that's where this is going to end."

Appellant believed that at last he "had reached a turning point." Shortly after that conversation—and about 10 days before Brad was scheduled to return to Kansas to celebrate his brother's birthday—Brad telephoned his mother in Kansas and "asked her to set up an appointment with the doctor out there." Brad called back about 2 days later to check on the appointment. He "made a commitment to [appellant] that he was going to go see the doctor who had helped him before." When asked, then, whether it had been at appellant's "instigation that [Brad] arranged for this doctor," appellant responded, "I would like to think that I finally got through, yes."

Throughout the approximately 3 months that Brad spent with appellant and his wife, Brad had followed a pattern of conscious deceit concerning his eating and his weight. For instance, Brad always wore very loose clothes, like "big, baggy shirts, long sleeves"; and, since he was almost 15 years old, neither appellant nor his wife ever saw him undressed. Moreover, Brad was an excellent cook, and typically appellant and his wife would arrive home from work about 7:00 p.m. and find that Brad had dinner waiting for them. When they would ask why he was not eating, too, he would answer that he had eaten while cooking. Appellant's wife testified, for example:

One night he took cube steak—no, not cube steak—chuck roast and cut it into cubes and made like shish kebabs and the like. And there was two dirty thing—you know, dirty plate and that in the sink, and two of the skewers were cleared off and that, and he had set the table for two. "Well, aren't you eating?" "Well, I already ate. See, it's in the sink." So, you know, he's fifteen. He was hungry. We didn't get in till almost seven. He ate.

Appellant put Brad on an airplane back to Kansas on July 27, and Brad had an appointment with the doctor the next day. His mother picked him up at the airport, took him home at Brad's insistence even though he looked "[h]ideous," unsuccessfully tried to get him to eat something, and finally let him go to bed. Brad's mother called a doctor that night and was told she could bring him in when the office opened the next morning. She found Brad dead in his bed at 7:00 a.m. The conclusion of the subsequent autopsy was death caused by "cardiac failure due to starvation."

Although a number of witnesses, both expert and lay, testified on both sides on the merits, the only expert witness who addressed actions and reactions of parents of an anorexic or bulimic child was Dr. Neal Satin, a psychiatrist with expertise in eating disorders. Dr. Satin then was Director of the Eating Disorder Program at the Institute of Pennsylvania Hospital, a member of the Board of Directors of the American Anorexia Bulimia Association of

Philadelphia, a frequent lecturer on eating disorders, and the treating physician or supervising physician in at least 200 such cases.

Dr. Satin's extensive testimony concerning anorexia and bulimia is fascinating and truly enlightening. For our present purposes, though, the critical portions relate to behavior of a child suffering from such a problem and relate, as well to the *parents* of such a child. Some critically important excerpts are as follows:

[Anorexic sufferers] often times display an interest in food in a way to control the food of the family so that no one knows what they're eating or not eating, and that they may claim, "Oh, I don't really have to eat dinner because I'm so busy serving. I nibbled before while I was preparing," this is a very common ·notion....

There's a characteristic concealing of the changes in their body size and shape in anorexia. The patient may be significantly underweight and malnourished but will wear several layers of clothing; a sweater, a baggie sweatshirt, long sleeves in the summertime—to conceal the changes that have taken place.... Families, when they see these patients, often express amazement that such changes could've taken place without their observation....

There's a deviousness about these patients that seems to be part of the illness. These are not people who are chronically tricky and deviant in their behavior, but once the illness starts, there's lots of abnormal behaviors to protect the starvation....

It's possible [for a person to cover up weight loss even up to 80 pounds]. It requires, you know, a great deal of effort, but it's certainly possible.

\* \* \*

Q. Doctor, do you know of any situations where persons have been anorexic, or bulimic, or both, and had weight loss and not had it observed?

A. Sure, I mean, it happens all the time....

In response to questions asking how parents of anorexic/bulimic children respond and concerning, specifically, appellant's responses, the following colloquys are instructive:

I think that invariably with families, they're no villains, they're only victims. Parents do the best that they can. They often do things that I wouldn't do as an expert, but they try to do what they can to get the individuals either to seek treatment, to eat, to change their behavior, and they are almost invariably unsuccessful.... And so I don't think that in these instances, parents can do anything right or wrong because there isn't a clear answer of what is right or wrong. I think that the best that parents can do is attempt to get the children to accept treatment and to hope that the people that are training are sufficiently competent and have enough expertise in the field that they can raise the likelihood of success a slight higher percentage....

\* \* \*

Q. And without—without giving us an opinion as to whether or not you feel Sergeant Robertson acted properly, do you believe that he reacted normally to this disease?

A. I'm sorry, I don't understand the question.

Q. Okay. Do you—did he react as most patients—or parents and patients of yours to this disease, from what you know of what he did in response to this situation?

A. Yes, he did. He attempted to convince the boy to go back to see the psychiatrist that he had seen previously.

Q. And that was the gentleman out in Kansas.

A. I—yeah, I believe that was a Doctor Boxer who was in Kansas. My understanding was that the boy had agreed, after some long struggle, to go back to Kansas for the specific purpose of reinstituting treatment with a doctor that he already knew, that he had some reluctance to get involved with the doctors in

this area for reasons that I'm not certain about, but had expressed a willingness to see Doctor Boxer again, and that that was, I think, a significant event. It was unfortunate that that did not happen, I mean that the boy died before he could start treatment again with Doctor Boxer and be evaluated. Nonetheless I think that trying to get a kid who has started in treatment to go back into treatment was the appropriate response for the family. It's something that is very, very difficult to get a kid to do who's resistent. And, you know, I think the only additional alternative that might've been available would've been to seek involuntary commitment. Now involuntary commitment is getting someone to have psychiatric treatment against their will. And that is something that is somewhat complicated, requires almost an expert to tell you how to get through the system.... But I think that the effort to get him to restart treatment was the responsible action that needed to be taken and appears to have been taken in this instance.

### B

■ The restricted role of this Court relating to the sufficiency of the evidence is limited to determining *legal* sufficiency. *See United States v. Turner*, 25 MJ 324 (CMA 1987). Thus, in the face of a challenge to the legal sufficiency of the evidence, this Court's charge is to answer "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)." 25 MJ at 324.

One of the elements of negligent homicide, of course, is simple negligence. *See* para. 85b(4), Part IV, Manual, *supra.* Paragraph 85c(2) defines simple negligence for purposes of this crime as follows:

Simple negligence is the absence of due care, that is, an act or omission of a person who is under a duty to use due care which exhibits a lack of that degree of care of the safety of others which a reasonably careful person would have exercised under the same or similar circumstances.

■ At the risk of over-simplification, appellant's approach to getting his son the continued medical treatment that appellant ultimately recognized was needed was to *persuade* his nearly 15–year–old, strong-minded son, who had demonstrated a willingness to physically fight appellant's effort to get him to a doctor. Some parents, on the other hand, might have pursued more *authoritative* action, just like some parents are more authoritative than others with their children on virtually all aspects of their upbringing.

Nonetheless, urging that negligence cannot be judged by hindsight or by the ultimate result, in essence appellant asks: If the boy's death were unknown (in order to preclude any subconscious impact), does the evidence establish beyond reasonable doubt that *his* approach was a *negligent* one? Stated in terms of paragraph 85c(2), did appellant's approach to parenting exhibit a lack of that degree of care for his son which a reasonably prudent parent would have exercised under the same or similar circumstances?

Measured against this standard, we conclude that the evidence is such that a reasonable factfinder could not find beyond a reasonable doubt that appellant's approach to caring for his son was negligent. The uncontroverted evidence demonstrates the following: Appellant had no knowledge of Brad's past medical difficulties relating to eating disorders or weight loss, except for being told Brad had an "iffy" stomach; Brad consciously and creatively concealed both the severity of his weight loss and his non-eating; even when appellant did become aware of these related symptoms, he did not fully appreciate their magnitude because of Brad's determined effort to hide them; and when Brad did exhibit a medical difficulty—dizziness—appellant promptly obtained medical attention for him.

Thereafter, he followed Dr. Nadhiry's advice and closely watched his son, tried to get him to eat, and asked his wife and friends of the family to assist him to persuade his son to eat; when it appeared 3 to 4 weeks later that it was not working, he set out to call Dr. Nadhiry, prompting a physical confrontation with his son who adamantly refused to return to her. Rather than fight his 15–year–old son who was physically and emotionally determined to resist, appellant set out to watch him closely and to persistently try to persuade his son that he needed medical help; indeed, appellant ultimately did exactly that, and his son called his mother to ask her to make an appointment with a doctor back home whom he had seen before.

 In light of Dr. Satin's testimony, we are at a loss how reasonable factfinders could find appellant's course of caring for his son to be criminally at odds with what "a reasonably careful" parent would have done under the same or similar circumstances.[2] Absence of negligence does not require that judgment be *right*, only that it reflect what a reasonably careful person would do. Brad died—and that truly is tragic. But that regrettable result does not necessarily mean that appellant was not reasonably careful. Indeed, Dr. Satin's testimony makes it clear that it does not necessarily mean even that appellant's actions were "wrong."

## III

The decision of the United States Army Court of Military Review is reversed. The findings and sentence are set aside. The charge is dismissed.

Chief Judge SULLIVAN concurs.

GIERKE, Judge (concurring):

I agree with the principal opinion. I write separately only to articulate an additional rationale that led me to the conclusion that the evidence in this case is legally insufficient to support appellant's conviction.

Appellant's negligence was based on the allegation that he failed "to provide proper medical and/or psychiatric care" for his son from "on or about 20 April [the last time appellant's 14 year-old son, Brad, was examined by a doctor] and continuing to 27 July 1988," the date his son left appellant's custody, such "failure" being the "proximate cause of" his son's death. The Government's theory was that appellant did not do the "right" thing which, in essence, would have required appellant to physically force his recalcitrant son to go to the hospital at some time prior to his son's death. During her final argument, trial counsel told the members:

> And ask yourselves, if this was your son, if he had gone from healthy to this, 40 pounds less in 3 months, what would you do? Would you let your son say, "I don't want to go to the doctor"? I think what you'd do is tie him up and put him in the car and take him to the hospital and have him admitted. But even if you wouldn't even go that far, you'd go to a doctor. You'd get some care for him.[1]

2. Perhaps the evidence regarding the offense involving appellant's stepdaughter, the conviction of which the Court of Military Review found unsupported by the evidence, subconsciously spilled over to fatally taint any realistic hope of a good-parent defense to the instant charge. *See generally United States v. Haye,* 29 MJ 213, 214 (CMA 1989); *United States v. Hogan,* 20 MJ 71, 73 (CMA 1985).

1. As a general rule, it is improper for counsel to identify the "reasonable person" with members of the very jury which is to apply the reasonable person standard. *See Beaumaster v. Crandall,* 576 P.2d 988, 994–95 (Alaska 1978); *Perry v. Fredette,* 110 N.H. 114, 261 A.2d 431, 432 (1970).

Although there was no objection, trial counsel's suggestion that the members ask themselves what they would do with their own son advocated an incorrect legal standard. *Cf. United States v. Shamberger,* 1 MJ 377, 379 (CMA 1976)(asking members to place themselves in position of victim's relative invites them to improperly judge issue from a personal rather than objective perspective). Appellant's decision to persuade rather than force his son to receive medical treatment may have been based in part on the unique circumstances facing him as the new guardian of a headstrong teenager whom he previously had not even seen for 7 years.

On appeal, the Government still contends that forced hospitalization would have saved appellant's son's life (or, at least, prolonged it temporarily), and implies that anything short of enlisting the assistance of health care professionals should be considered negligence under the circumstances.

I have no doubt that hospitalization may have at least prolonged the life of appellant's son. However, in determining whether appellant was criminally negligent, the question is not whether a reasonable person should have determined that medical care was appropriate prior to the death of appellant's son. Rather, the question is whether there was any evidence to prove that a reasonable person in appellant's position would have recognized that at some time prior to his son's scheduled appointment, the need for *immediate* medical intervention made *forced* hospitalization the only rational option. The evidence is uncontradicted that appellant attempted to persuade his son to seek medical help and was ultimately successful in convincing his son to have his mother schedule an appointment with a doctor in Kansas. More significantly, however, I believe that the evidence fails to establish that a reasonable person in appellant's position would have known, prior to appellant's son's death, that *immediate* medical intervention was necessary. Accordingly, I concur that the evidence is legally insufficient to support appellant's conviction.

A parent's legal duty to provide medical assistance for his or her children is based upon the "inherent dependency of a child upon his parent to obtain medical aid, i.e., the incapacity of a child to evaluate his condition and summon aid by himself, supports imposition of such a duty upon the parent." *Commonwealth v. Konz*, 498 Pa. 639, 450 A.2d 638, 641 (1982). Thus, when a parent knows or should know that his or her child needs immediate medical intervention, failure to act within a reasonable time to seek such aid may be a breach of that duty. *Cf. Bergmann v. State*, 486 N.E.2d 653 (Ind.App. 4 Dist.1985)(affirming reckless homicide conviction of parents who

"treated" 9–month–old daughter who died of bacterial meningitis with prayers and fasting instead of seeking medical care).

On the other hand, consideration must be given to alternative courses of conduct available to a parent. "[P]arents are vested with a reasonable discretion in regard to when medical attention is needed for their children." *See Craig v. State*, 220 Md. 590, 155 A.2d 684, 689 (1959). It follows then that, absent evidence that a reasonable person would recognize the need for immediate medical intervention, the decision to persuade rather than use force or trickery to get a reluctant adolescent to receive medical care is also within a parent's discretion.

A conviction of negligent homicide requires proof that death resulted from the simple negligence of the accused. Para. 85b(4), Part IV, Manual for Courts–Martial, United States, 1984. Proof of simple negligence requires a showing that the accused failed to use "that degree of care [for] the safety of others which a reasonably careful person would have exercised under the same or similar circumstances." *Id.; United States v. Gordon*, 31 MJ 30, 34 (CMA 1990). Such a person "is not necessarily a supercautious individual devoid of human frailties." *See Whitman v. W.T. Grant Company*, 16 Utah 2d 81, 395 P.2d 918, 920 (1964). As the late Chief Justice Holmes once noted, a choice "may be mistaken and yet prudent." *Kane v. Worcester Consolidated Street Railway Co.*, 182 Mass. 201, 65 N.E. 54 (1902).

In the instant case, the doctor who examined appellant's son on April 20 (Dr. Nadhiry) found his son to be "in good health" and saw "no need for immediate" medical "intervention" at the time. She admitted that she did not make a "definitive diagnosis" at the time that appellant's son had "anorexia nervosa" but claimed to have made appellant and his son aware of the "problems" associated with anorexia after they discussed his son's eating habits. However, she did not profess to be an

expert on the disease and did not elaborate on the "problems" she discussed.

Appellant cannot be held criminally responsible for knowledge of medical risks which are neither readily apparent nor known to him. *Cf. Fabritz v. Traurig,* 583 F.2d 697, 698 (4th Cir.1978) (child-abuse conviction vacated where record lacked evidence indicating that mother had knowledge of fatal nature of 3–year–old daughter's condition when she deferred seeking professional medical care for her). The mere fact that Dr. Nadhiry discussed the "problems" associated with a disease that she did not diagnose appellant's son as having is hardly sufficient evidence to place appellant on notice of the future seriousness of his son's need for medical care.

For example, there is no evidence in the instant case that Dr. Nadhiry explained that anorexics generally hide their weight loss and conceal their suicidal behavior, are able to eat and still lose weight by secretly vomiting, may stay alert and active right up to their death, or may suffer a quick and sudden death caused by a potassium deficiency related to the weight loss and vomiting. Also, there is no evidence that she told appellant to monitor his son's weight loss or that, because the last phase of anorexia is generally short and terminates abruptly through heart failure, involuntary treatment might be necessary to save his life. Moreover, by asking appellant's son to make a follow-up appointment in "three to four weeks," Dr. Nadhiry did not indicate that she believed time was of the essence or that she was even alarmed by his son's condition.[2]

No evidence established that, at any time during his stay with appellant, appellant's son's illness rendered him helpless and un-

able to summon aid by himself. Appellant's son suffered from an unusual, long-term psychiatric eating disorder in which receptiveness to treatment was important for its cure. He resisted treatment while continuing to stay active. He attended school and performed routine activities that included mowing a friend's lawn just 2 days before he left appellant.

While likely to become noticeable over a significant period of time, the steady weight loss of appellant's son would be almost imperceptible on a daily basis, especially where the uncontradicted evidence indicates that his son attempted to hide his weight loss and deceive appellant about his eating habits. To say that appellant was negligent for failing to force his son to get medical care sooner than his scheduled appointment based on his son's physical condition at the time of his death begs the question of how much sooner: after his son initially refused to get a follow-up examination?; after his son lost 20 more pounds?; 30 pounds?; 35½ pounds? The negligence of an individual's conduct (or lack of it) must be determined "in the light of the possibilities apparent to him at the time, and not by looking backward 'with the wisdom born of the event.'" W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on The Law of Torts* 170 (5th ed. 1984), quoting Cardozo, C.J., in *Greene v. Sibley, Lindsay & Curr Co.,* 257 N.Y. 190, 177 N.E. 416 (1931). Once appellant was aware his son had an appointment to see a doctor upon his son's return to Kansas, he had no apparent reason to force his son to seek medical treatment in New Jersey ahead of his scheduled appointment.[3] To be sure, there was nothing magic about the fact that his son died of cardiac failure at

2. Dr. Nadhiry testified that she "left it open" for appellant and his son to make a follow-up appointment, not because she did not care if they made the appointment (she did), but because his son was "unfriendly" and resistant to her and further counseling. She took a nonaggressive approach to gain his trust and confidence to get him to be receptive to further evaluation. Maybe not so coincidentally, appellant took a similar approach to get his son to schedule an appointment to see a doctor.

3. Even the mother of appellant's son admitted that, although she was shocked by her son's condition when she had picked him up at the airport in Kansas and moved up his appointment by several hours, she did not immediately force her son to go to the hospital before taking him to her house because she "didn't honestly believe that he was going to die."

the weight of 80 pounds. Uncontradicted evidence in the record indicated that, while anorexics may die suddenly after extreme weight loss, they may also live at much lower body weights than Brad's without complication.

The evidence fails to establish when immediate medical intervention for appellant's son would have become apparent to a reasonable parent while his son was in his custody. It assuredly was not necessary on 20 April; and by the time appellant's son died, appellant had successfully persuaded him to see a doctor. Unfortunately, his son was scheduled one day too late. Accordingly, absent evidence that appellant was or should have been aware that immediate medical intervention was required sooner than his son's doctor's appointment, the mere happenstance of his son's sudden death after a 40–pound weight loss cannot in hindsight establish that appellant was negligent for failure to more timely obtain professional assistance. Since I believe that simple negligence was not established in this case as a matter of law, I concur that appellant's negligent homicide conviction cannot stand.

COX, Judge, joined by CRAWFORD, Judge (dissenting):

Viewing the evidence in the light most favorable to the prosecution, which is the appropriate mode for reviewing the legal sufficiency of evidence,[1] there can be no serious question that the evidence of appellant's negligence is sufficient to sustain his conviction. See Art. 67(c), Uniform Code of Military Justice, 10 USC § 867(c) (1989). The obvious reason for our viewing evidence in the light most favorable to the prosecution is that the defense evidence, for one reason or another, did not sway the factfinder. Unrebutted or not, the factfinder was not bound to accept it on its face, to the exclusion of all other evidence and logical inferences. The question then is whether the prosecution presented enough evidence such that *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The logical place to look, therefore, is the prosecution's evidence.

In so doing, it becomes immediately apparent that there was a plethora of prosecution evidence. The case was prosecuted on the theory that appellant was negligent in "failing to provide proper medical and/or psychiatric care to" Brad, appellant's minor son (he was 14 years old during most of the time he was in appellant's charge).

In February and March 1988, Brad was undergoing treatment in Manhattan, Kansas, by a physician, Dr. Crane, and a psychiatrist, Dr. Boxer. On February 1, Dr. Crane's records describe Brad as a "14 year old male with history of intermittent vomiting supposedly for the last 5 or 6 days." The medical records on that date show Brad's "Weight 146¼ pounds; height 67½ inches." On February 8, the records reflect his weight as 144¾ pounds. Further entries are recorded for February 15, 18, and 19, but no additional weights are reported.

Dr. Boxer's records, reporting an evaluation on February 22, 1988, reflect that Brad

---

1. In *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979), the Supreme Court articulated the standard for reviewing legal sufficiency of evidence that we have consistently applied. As the Court noted:

> After [*In re*] *Winship* [, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970),] the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Woodby v. I.N.S.,* 385 U.S. [276,] at 282[, 87 S.Ct. 483, at 486, 17 L.Ed.2d 362 (1966) ] (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Johnson v. Louisiana,* 406 U.S. [356,] at 362[, 92 S.Ct. 1620, at 1624–25, 32 L.Ed.2d 152 (1972) ].

(Footnote omitted.)

has had a one month history of intractable vomiting.... In a one month period he has gone from a weight of 160 pounds to a present weight of 141 pounds at a height of 5 foot 6 inches. Brad says that he will vomit any solids that he attempts to eat. He has been able to hold down liquids only. He sleeps thirteen hours an evening....

Dr. Boxer's records reflect subsequent psychotherapy sessions on March 2, 3, 4, and 9, with no additional weight measurements reported.

Sometime in March 1988, apparently after the March 9 session, Brad travelled from Manhattan, Kansas, to Fort Dix, New Jersey, to visit appellant for the week of spring break. Upon returning to Kansas, Brad announced that he was returning to Fort Dix to live with appellant. An entry in Dr. Boxer's records reflect that, on March 23, 198[8], he phoned Brad, and Brad "[d]ropped major news that tonight he is leaving Manhattan to live" with appellant. Brad's mother recalled that, after spring break, Brad "came back for several days and then went back out [to New Jersey]. So it probably was just about the 1st of—right around the 1st of April." Appellant's wife remembered it as "the last week of March" that Brad came to New Jersey to live.

Describing Brad's physical appearance at the time of his departure to live with appellant, his mother testified:

He was tall and thin, didn't look, you know, thin-thin. He probably [was] between 135 and 140 pounds, but he was a good bit taller than I was. He was feeling better. He was not eating full, three-meal—three big meals a day, but he was eating, you know, maybe six times a day, small amounts.

At that time, he was "back in school" and "out playing basketball with the kids."

The record does not reveal how much appellant knew, prior to Brad's moving to New Jersey, about his physical and mental condition. However, there is evidence that appellant was specifically made aware of the general nature of the situation shortly after Brad's arrival. This came about because, on April 17, 1988—2½ to 3½ weeks after his arrival, Brad paid a visit to an emergency room at Fort Dix, due to dizziness and difficulty breathing. By that time, his weight had dropped to 125 pounds.

Three days later, on April 20, he was seen on a follow-up basis by Dr. (LTC) Grace Nadhiry, a pediatrician at Fort Dix. By this time, Brad's weight had dropped to 122 pounds. *According to Dr. Nadhiry, appellant was "present throughout the entire visit."* (Emphasis added.) Dr. Nadhiry "tried to get more history into [Brad's] eating habits, about how he was doing in school." Brad

stated that he used to have nerves and so he doesn't eat very well, and he had lost some weight and that brought up the topic of anorexia. Then he stated that he had been evaluated for anorexia by psychiatrists and he was—he had been evaluated and was told by psychiatrists that he didn't have anorexia.

Asked by the prosecution on direct examination, "Why did you begin to speak to Brad and his father about anorexia?," Dr. Nadhiry responded:

Because I was trying to find out what the reason for his dizziness was on the day of his visit to the emergency room. And then Brad talked about his diet on that day. And also I asked him what he had [to eat] on the day he visited, and he hadn't had anything at that time. So I brought up the topic of anorexia and Brad seemed to be already aware of it. And he said he was evaluated for that and he was told he didn't have that.

\* \* \*

I spent some time talking to him about anorexia, I mean talking to both Brad and his father, and the problems that were associated with anorexia, especially in a boy. I remember especially mentioning to him that I had a patient, a male patient, with anorexia I had taken care of earlier and I told Brad that he could— you know, mostly talk to him, try to get

his friendship, try to get his confidence, so—without appearing to be more aggressive and try to do too many things at that time, I left it open for him to come to me and told him that I was available for him to call and talk to me and that he needed further evaluation when the records should be available, the previous records of his other hospital, and the psychiatric—psychiatric visit, and that was the plan, to see him, but the initial attempt on my part was to have some type of friendship made with Brad.

\* \* \*

I had talked to Brad's father at the time and ma[d]e him aware of the problems that could come up and asked him to follow—follow-up with the clinic later on.

The April 20 visit with Dr. Nadhiry was Brad's last contact with a doctor until his death—just over 3 months later—**when Brad's weight had dropped to about 80 pounds!** Despite the multitude of medical, psychological, psychiatric, and social resources available without cost to servicemembers and their dependents by merely picking up a telephone, there is no evidence that appellant ever took any meaningful action during that interval to enlist the assistance of any health care or social professional or agency. Indeed there is no indication that appellant ever so much as notified any person in a position of public trust or authority, or any agency, that he was having a problem with his son! This wholesale failure to seek professional assistance—particularly if normal parental suasion was not working—is the precise theo-

ry of negligence upon which appellant was prosecuted and convicted.[2]

Brad flew back to Kansas on July 27, 1988, and was found dead in bed by his mother on the morning of July 28, 1988. An autopsy was conducted July 29, and the pathologist, Dr. (Colonel) Mani Bala, determined the cause of death to be "emaciation and cachexia due to starvation, cardiac failure due to starvation." According to Dr. Bala, Brad's body weight, 80 pounds, would have changed very little from the time of death since it was kept refrigerated overnight and was not exposed to the environment. Dr. Bala described Brad's appearance as

just like wasted away to the point you can see the bones on the body. It's like—almost like having skin shot on a skeleton. That's what cachexia means, wasted down to the bones.

Dr. Bala found no evidence of physical disease, "except that he had all signs pointing to long-term starvation or anorexia—well, emaciation from starvation." Asked to describe "the process of death ... for one who dies of starvation," he responded:

A. Well, starvation is a very vague term but if you want to call starvation into two different categories, long or short term, this would apply in the long term category because having been more than a month situation is a long term.... [L]ong term links to a chain of events that results in cardiac failure, the ultimate mechanism for death. In other words, the person was healthy to begin with and he starved for, say, six months,

---

**2.** Trial counsel speculated during argument of findings that the reason appellant did not get Brad medical attention was that he did not want to attract additional attention to his parenting—and risk further abuse charges—in light of the ongoing State of New Jersey investigation into allegations that he sexually abused his minor stepdaughter. *See* text *infra.*

This speculation was hardly dispelled by the following typical portion of appellant's generally nonresponsive answers on cross-examination:

Q. .... In June, around the middle of that time [1988], your civilian case, the civilian charges against you were still pending, weren't they?

A. They definitely were.

Q. Okay. And, isn't it true that you told Barbara Sturgill that you didn't want to force him [Brad] to go to the hospital because you were afraid of a child abuse investigation?

A. Not for myself, I wasn't afraid, ma'am.

Q. Isn't it true that you told Melissa Chamberlain, an Air Force friend who was living at your house, that you were afraid to force him to go to the hospital because you were afraid of a child abuse investigation?

A. Not as far as the results or the impact upon myself.

they would expect the—all the glucagon source to be utilized first. And then after that is exhausted then the fat stores are utilized. So he starts to use away his stored fat in the body. And after that is exhausted then he goes into what is called a protein-use phase, that the muscles are used for creating energy and glucose. And if that phase continues on then he goes into the metabolic phase where he's accumulating metabolites from which he—the body succumbs to death, *and that is exactly what happened in this case.*

Q. While the individual is in the protein-use phase or the ... phase where the muscle is being used, what physical effect does that have on the individual?

A. It won't be noticeable *except he's going to be very weak and getting weaker steadily as more and more muscles have wasted away to create more energy for his body.* And you'll find out that his ability to walk or at least stand up might be impaired. He stays alert to the last minute but generally the body loses its energy, you know, ability to move around.

Q. And that would be a—did I understand you correctly to say that would be a gradual process?

A. Yes, it is, but the last—*towards the last phase it is going to be more visibly noticed by these disabilities and debilitation.*

Q. How long would the last phase be?

A. Generally not very long. In such a situation whereas he comes to the terminal phase, he is going to have other manifestations. Well they can stay alert, they can still stay active to the point they can do the routine, you know, in-house activity, but he will start manifesting exhaustion, tiredness very easily, then ultimately they go into cardiac failure very abruptly. The body can cope with so much weight loss and abuse, but the state goes out [sic] while the mechanism begins to fail where he cannot generate any more glucose or he cannot excrete his metabolites and then he begins to fail very rapidly.

Q. Did you find evidence in Brad of this gradual muscle use?

A. Yes, I did. Yes, the muscles were all wasted down to the bones. The pictures will tell you all the details,[3] but *he was really burned down or cachectic to the point it's almost like a mummy dug out of [the] grave* and—

Q. Did you find any damage to Brad's heart when you examined it?

A. Well he has—well his heart was smaller than usual. For his age and height he should be at least—it was 200 grams I think the weight was—it should be around 300 grams. So he had wasted down substantially; smaller in size and also in its muscle mass.

(Emphasis added.)

Asked, "If an individual weighed 122 pounds and dropped to 80 within about three and a half months, would that weight loss be noticeable?," Dr. Bala responded, "You bet, absolutely."

Such was the strapping lad appellant feared would "punch ... [his] running lights out" if appellant sought medical attention. Dr. Bala was confident that, had Brad received medical attention as little as 24 hours before his death, he would have survived.

Dr. Bala's description of Brad's appearance was corroborated by other witnesses. Brad's mother described his looks when she first saw him at the airport as:

Hideous. He looked like a walking skeleton. I've never seen anything like that before in my life. I almost didn't know him.

**3.** Defense counsel objected to admission of the pictures on the ground that "a couple of the photographs ... looked like they are straight from Dachau." Indeed, these post-mortem photographs, a number of which were received in evidence, are virtually sufficient in and of themselves to overcome a legal sufficiency challenge. They portray a young man who is a virtual skeleton—nothing but skin and bones.

The safety pins he used to hold up his pants caused "sores on his side" that had to be covered by band-aids.

Mrs. Jones testified that her first instinct was to take Brad directly to the hospital rather than home; but Brad was exhausted, and he wanted to see his brother. As she had already set up a doctor's appointment for Brad the next day, she agreed and took him home. Cuddling him that night on the couch, she noted:

> There was nothing to him. His face was so drawn in and his eyes stand so big and it's a hideous comparison. He looked like ET. He's never had bucked teeth in his life but he did then or it appeared that he did.

A teacher at Sylvan Learning Center in New Jersey, where Brad received approximately 24 hours of coaching between May and July, 1988, also noted his deterioration. By late July, the teacher described him as being

> very, very thin. I mean his skin was white. You could almost—it's almost like you could see through it. And he had cuts—little cuts down his arm and he was very weak. He had trouble making it through the last hour that I taught with him and he complained that he was perspiring and thirsty.

He had to stop the session because "[h]e said he was getting dizzy spells and he was perspiring and he just couldn't concentrate."

Appellant gave the Learning Center director the impression that Brad had recently been released from the hospital and that everything that could be done for Brad was being done. The director "probed a little bit to find out what the illness had been, [but] there was resistance to sharing it with me and so ... [she] respected their privacy." The general supposition at the Center was that Brad had either "AIDS or cancer."

Appellant's defense at trial, essentially, was that it was not reasonable to foresee that Brad was dangerously ill or that he would die and that appellant was doing everything he could think of to get Brad to eat. The adequacy of the military judge's instructions on negligence, proximate cause, etc., are not in issue.

As indicated, looking only to the prosecution's evidence, I am satisfied it was more than sufficient to sustain the findings of guilty. As I view the prosecution's evidence, the legal adequacy of the evidence of neglect and proximate cause, *inter alia,* are beyond dispute. Nevertheless, under the circumstances of this case, I may have been persuaded to grant appellant a rehearing on findings for several unrelated reasons. The action by the majority, completely reversing the case and dismissing the charge, obviates the necessity of my deciding upon such a course. But as a matter of intellectual curiosity I will advance my thought processes for such a result.

First, a major tenet of appellant's trial defense was that he was a loving, caring father who did everything reasonable to care for Brad. However, by the time the court members learned that appellant had supplied his 14–year–old stepdaughter with a penile-simulator—a battery powered "vibrator," plus attachments and "Motion Lotion"—I assume that the good-father/doing-everything-I-could-do defense to manslaughter was essentially worthless. Those items of tangible evidence were adduced in connection with the indecent-act charge, which was the residuum of the lengthy State of New Jersey investigation mentioned above. By the grace of the Court of Military Review, however, the indecent-act charge no longer burdens appellant.

Under the unique circumstances of this case, I believe the danger of "spill-over" is simply too great to ignore. Whatever shred of credibility appellant's defense to manslaughter and negligent homicide might have had was severely compromised by the introduction of evidence related to what the Court of Military Review has concluded did not amount to crime. Therefore, I believe that fairness may have warranted appellant's having a rehearing on the remaining charge—negligent homicide.

In addition, such a rehearing would also provide the factfinder an opportunity to pass specifically on the elements of Article 134, UCMJ, 10 USC § 934, which are present in the negligent-homicide charge, but were not necessary to a finding of manslaughter. *Cf. United States v. Sadler*, 29 MJ 370 (CMA 1990). For these reasons, I might have been convinced to reverse the decision of the Court of Military Review, set aside the findings and sentence, and authorize a rehearing.